**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

| | | |
|---|---|---|
| **JOHN LEE HESSERT,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **6:17-CV-00189-KOB** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On August 30, 2012, the claimant, John Lee Hessert, applied for disability insurance benefits

under Titles II and XVI of the Social Security Act. The claimant alleged disability beginning on

March 31, 2009, because of a cancerous basal cell carcinoma on the left side of his face, a severe

groin injury, a heart condition, and depression. The Commissioner denied the claim on

November 6, 2012. The claimant filed a request for a hearing before an Administrative Law

Judge, and the ALJ held a hearing on June 8, 2015. (R. 21, 67–68, 79, 153).

In a decision dated July 25, 2015, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and therefore was ineligible for Social Security benefits. The

Appeals Council denied the claimant's request for review on December 5, 2016. Consequently,

the ALJ's decision became the final decision of the Commissioner of Social Security. (R. 1, 31).

The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant

1

to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES

AND REMANDS the decision of the Commissioner to the ALJ for reconsideration.

## II.  ISSUE PRESENTED

Whether the ALJ erred as a matter of law in not considering Listing 12.05(C) regarding the

claimant's IQ score of 70.[1]

## III.STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm

the ALJ's decision if he applied the correct legal standards and if substantial evidence supports

his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir.

1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations supported by substantial evidence. "Substantial

evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature

and extent of a claimant's residual functional capacity, and the application of vocational factors

"are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner

---

[1] Although the claimant presented issues about whether substantial evidence supported the ALJ's decisions to give opinions from the claimant's treating physician Dr. Tai little weight and to discredit the claimant's subjective testimony, the court will reverse on this issue alone. However, the court has concerns about whether substantial evidence supports the ALJ's decision to give little weight to Dr. Tai's opinions about the claimant's mental limitations. On remand, the ALJ should re-address that issue in light of this court's ruling regarding Dr. Blotcky's opinion.

because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court disagrees with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The ALJ commits reversible error if he exercises his discretion to disregard medical evidence in favor of his own impressions. "An ALJ...abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Marbury v. Sullivan*, 957 F.2d 837, 840 (11th Cir.1991) (Johnson concurring).

To meet the 12.05(C) criteria for intellectual disability, the claimant must have a valid IQ score between 60 and 70 and another physical or mental impairment that imposes additional occupational limitations. *Smith v. Comm'r of Soc. Sec.*, 535 F. App'x 894, 897 (11th Cir. 2013)

(quoting *Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir. 1992)).[2] An IQ between 60 and 70 creates a rebuttable presumption that the claimant's intellectual disability was present before the age of twenty-two because IQ scores are fairly consistent across life; however, a low IQ is not indicative of disability if the score is inconsistent with other evidence in the record about the claimant's daily activities and behaviors. *Perkins v. Comm'r of Soc. Sec.*, 553 F. App'x 870, 873 (11th Cir. 2014).

## V. FACTS

The claimant was forty-four years old at the time of the ALJ's final decision. The claimant dropped out of high school around the age of sixteen and does not have a GED. His past relevant work includes cashier, yard maintenance worker, and a deburrer of machine parts. The claimant alleges disability based on a basal cell carcinoma on the left side of his face, a severe groin injury, a heart condition, and depression. (R.43–44, 46, 29, 68).

### *Physical Impairments*

The claimant stated he had a "post block" treatment for back pain some time in 2001 because he had a herniated disc between the L4 and L5 vertebrae. (R. 51).

The claimant had a basal cell carcinoma of the left nasal canthal region and nose surgically removed from his face by plastic surgeon Dr. Frank Lomagistro on August 11, 2009. During the claimant's follow-up visit with Dr. Lomagistro on August 31, 2009, Dr. Lomagistro indicated that the surgical wound was healing properly. In another follow-up appointment on September 28, 2009, Dr. Lomagistro noted that the claimant was doing well; reported no evidence of the cancer's recurrence or other problems; and instructed the claimant to return for a checkup in

---

[2] On August 1, 2013, the Social Security Administration amended the 12.05 regulation, replacing "mental retardation" with "intellectual disability" because the former term has negative connotations and some people consider it offensive. The Eleventh Circuit determined the change in terminology does not affect the actual medical definition of the disorder or available programs and services. *Hickel v. Comm'r of Soc. Sec.,* 539 F. App'x. 980, 982 n.2 (11th Cir. 2013).

another month and follow-up with a dermatologist. Dr. Lomagistro's records do not indicate if the claimant did either. (R. 426–27).

The claimant went to the emergency room on December 31, 2010, for abdominal pain he rated a ten out of ten on a scale of zero to ten. The claimant reported that he had experienced aching pain for five days; he also reported experiencing nausea. Upon admission to the hospital, nurse practitioner Pamela Griffin game him intravenous morphine for pain and Reglan to treat gastrointestinal distress. The claimant left the hospital on January 1, 2011, with no explained etiology for his abdominal pain other than a possible renal cyst. Dr. Julie Shamas prescribed the claimant Pepcid for acid relief and Zofran to treat his nausea; advised him to follow-up with a primary care physician; and instructed him to return to the ER if his symptoms worsened. (R. 500–08, 513).

On June 15, 2011, the claimant had a syncopal episode and lost consciousness for one minute after standing up and experiencing dizziness. Dr. Alex Viegas admitted the claimant to Winter Haven Hospital for observation. While there, Dr. Randall Kramer examined the claimant on June 16 after Dr. Viegas asked him for a medical consult. Dr. Kramer noted that the claimant reported no heart palpitations or chest pain but still experienced dizziness. Dr. Kramer reported that the claimant occasionally smoked marijuana, drank one to three cups of coffee a day, and that medical tests revealed no abnormalities in his heart beat or rate. Dr. Kramer found no determined cause of the syncopal episode, but warned the claimant that he could have a bacterial infection. Dr. Kramer urged the claimant to obtain a primary care physician and prescribed him one 81 mg aspirin a day and a short-term dose of Cardizem to maintain his blood pressure and sinus rhythm. Dr. Viegas noted in the claimant's final assessment that the claimant had a suspected type of

atrial fibrillation and syncope. Dr. Viegas discharged the claimant on June 17, 2011. (R.475, 480, 450–51, 486–87).

On October 7, 2011, the claimant went to the ER at Winter Haven Hospital experiencing groin pain that Dr. Victor Aramayo diagnosed as a right inguinal hernia. The claimant indicated that the hernia appeared about a month before and that he had painful urination, groin pain, and diarrhea. He also reported a prior history of depression. The claimant rated the pain a ten on a scale of zero to ten. Dr. Aramayo gave the claimant acetaminophen and Ketorolac for his pain, Rocephin to treat a possible infection, and advised him to follow-up with Dr. Aronski, the surgeon on call. Before releasing the claimant from the ER, Dr. Aramayo also prescribed the claimant Keflex, an antibiotic, and Naprosyn for his pain. Nothing in the record suggests that the claimant followed-up with Dr. Aronski. (R. 457–61, 464, 469).

At the request of the state of Florida Disability Determination Services, Dr. Ricardo Varas performed a consultative examination of the claimant on October 27, 2012.[3] Dr. Varas indicated that the claimant reported mild tingling or numbness around the surgical site from his cancer surgery but no other facial symptoms. The claimant also reported that he injured his groin during a bike accident in April 2011; when the pain worsened, a doctor in the ER diagnosed him with a hernia and urinary tract infection; and without insurance, he could not pay for surgery to fix his hernia. While the claimant reported experiencing chest pain and angina, Dr. Varas noted that the claimant was unable to provide much information about his 2011 syncopal episode. The claimant also told Dr. Varas that his groin pain significantly restricted his movement and abilities to stand or walk for long periods of time, do chores, drive, and lift objects heavier than ten pounds. (R. 524–25).

---

[3] Prior to this date, the claimant lived in Florida. He moved to Alabama sometime in 2013 to live with his dying mother.

Dr. Varas described the claimant's gait as slightly abnormal with a limp of his right leg but noted that the claimant was able to get on and off the examining table without difficulty. He reported that the claimant had some mild deformity of the nose from his cancer surgery but had no open wounds or keloid formation. Dr. Varas further reported that the claimant had a right inguinal hernia that made it difficult for him to squat and completely perform a straight leg test with his right leg. Examination of the claimant's spine revealed no trigger points. (R. 526–27).

Dr. Varas opined that the claimant's skin cancer should not be taken into account for his disability, but that it could limit his ability to find a job working outdoors. Dr. Varas indicated that, without a better history from the claimant or medical records from the syncopal episode, he could not make a full determination about the claimant's possible heart condition. He stated that with surgery, the claimant's right inguinal hernia would probably significantly improve or disappear, allowing him to return to work. Finally, Dr. Varas noted that the claimant needed better access to healthcare. (R.526–27).[4]

On December 18, 2012, the claimant completed a supplemental pain questionnaire for the State of Florida Department of Health. He indicated the pain level for his groin was eight on a scale of zero to ten; that he took only acetaminophen for his pain and it only "worked" for a while; and that his pain limited his ability to prepare meals, bathe himself, clean, shop, sleep, and drive. (R.371–73).

On June 18, 2014, nurse practitioner Lindsay Todd treated the claimant for pain and a cyst on his lower back at the Capstone Rural Health Center, prescribing him Neurontin for pain. (R. 535–36).

---

[4] The ALJ did not state the weight given to Dr. Varas's report or that he relied upon it in his final determination. Information in Dr. Varas's report is also present in more recent reports from Dr. Tai and Dr. Moizuddin.

Dr. Eugene Tai treated the claimant for pain on November 13, 2014 in Jasper, Alabama. The claimant complained of pain in his lower back, right groin, and the area around his left eye near the site of his cancer surgery, and of a possible infection around his L4-L5 vertebrae. The claimant rated the pain around his eye an eight out of ten on the pain scale. He made no complaints about his heart. In the claimant's medical history, Dr. Tai indicated that the claimant had his tear duct removed from his face as part of his cancer surgery and his right groin hernia was repaired in 2014. Dr. Tai noted that the claimant experienced spinal tenderness at the L2-L5 vertebrae; his heart beat was regular; and that the claimant was "disabled" with no further explanation. Dr. Tai prescribed the claimant Motrin for pain. (R. 584–85).

At the request of the Social Security Administration, physician Dr. Samia Moizuddin, performed a consultative examination of the claimant on February 4, 2015. The claimant reported that he had cancer surgery in 2006; that he had hernia surgery in 2013 but still experienced pain in his groin when he lifted anything over ten pounds; that he had never received pain management treatment or narcotic pain prescriptions; that his left eye watered a lot and produced a discharge; that he had back pain but could only afford to take over the counter pain medicine; and that, although he still experienced some dizzy spells, he had not experienced another syncopal episode since June 2011. (R. 542, 548).

Upon examination of the claimant, Dr. Moizuddin determined that he could continuously lift and carry objects less than ten pounds; occasionally lift and carry between twenty-one and fifty pounds; sit, stand, or walk for a maximum of three hours without taking a break; frequently kneel, crouch, or crawl; continuously climb stairs and ladders, maintain his balance, and stoop; could not read small print; could read newspaper print and a computer screen; could walk at a reasonable pace; and could take care of his daily needs. Her final assessment noted that the

claimant had abdominal pain in the lower right quadrant, degeneration of lumbar or lumbosacral intervertebral disc, a history of skin cancer with surgical resection, and a history of inguinal hernia with either a probable recurrence of the hernia or nerve damage. (R.543–50).

On March 4 and 20, 2015, the claimant returned to Dr. Tai for treatment of his lower back pain. Dr. Tai indicated no new injuries or changes in the claimant's physical condition; advised the claimant about healthy diet and exercise; and prescribed him Norco and Motrin for pain. Dr. Tai made no mention of the claimant's heart problem. (R. 587–91).

On March 20,2015, Dr. Tai completed a function report about the claimant's alleged disabling pain and impairments. Dr. Tai reported that the claimant's pain would negatively affect his work performance and cause the claimant to miss on average more than four days of work a month. He also indicated that the claimant's medication would cause the claimant to experience difficulties in concentration and drowsiness. Dr. Tai reported that the claimant could only occasionally maintain his balance, kneel, or crouch; never climb or stoop; stand for no more than three hours; walk no more than twenty minutes; could not sit longer than thirty minutes; and must lie down for thirty minutes three times a day. (R. 560–64).

*Mental Impairments*

During his consultative examination with Dr. Moizuddin on February 4, 2015, the claimant reported experiencing anxiety and a depressed mood. The claimant also reported that he lived alone, did not drive, and that the only thing he did for enjoyment was watch the sunset. (R. 548–49).

During his March 4, 2015 visit with Dr. Tai, the claimant complained of anxiety, depression, and suicidal thoughts, saying he wanted to "do away with himself." Dr. Tai prescribed the claimant Zoloft and Ativan for anxiety and depression. He also provided the claimant with five

minutes of counseling and encouraged him to reduce his stress by learning to cope better with problems. Dr. Tai told the claimant to see a counselor or psychiatrist if necessary. (R. 586–88).

At the request of the claimant's attorney, clinical psychologist Dr. Alan Blotcky examined the claimant and performed a psychological evaluation of him on March 16, 2015. The claimant reported experiencing depression since his skin cancer diagnosis; described his depression as "constant and unwavering"; said he only had one close friend; did not visit with any family; had no special interests or hobbies; and primarily watched television all day. The claimant told Dr. Blotcky that he dropped out of school in the 12th grade; did not have a GED; and was a slow learner in regular classes.[5] (R. 571).

Dr. Blotcky described the claimant as tired and worn with low energy and a restricted affect. He noted that the claimant cried during the interview, seemed depressed, and that his verbalizations "were morbid in content." Dr. Blotcky noted that the claimant demonstrated logical and orderly thinking; had limited abstract thinking; had functioning memory; had grossly intact judgment; and had fair insight. (R.571–72).

Dr. Blotcky administered the WAIS-IV psychological test to the claimant that indicated that the claimant had a full scale IQ of 70. Dr. Blotcky noted that this IQ score is at the lower end of the borderline range of intellectual abilities. On the WAIS-IV, the claimant scored a verbal comprehension index of 74, a perceptual reasoning index of 75, a working memory index of 74, and a processing speed of 76. Dr. Blotcky also reported that the claimant had a valid Global Assessment of Functioning score of 49, indicating that he had serious symptoms or serious social and occupational impairments. (R. 572–73).

Dr. Blotcky reported that the claimant was motivated during his exam and had valid test scores. He assessed the claimant with a depressive disorder and noted that his borderline

---

[5] The claimant testified, however, that he dropped out of high school around the age of sixteen.

intellectual abilities "are a lifelong problem." He recommended that the claimant receive a combination of medication and individual counseling for his depression and borderline intellectual abilities. Dr. Blotcky noted that the claimant's prognosis was poor because of his depression and limited intellect. (R.572–73).

During his follow-up with the claimant on March 20, 2015, Dr. Tai indicated no changes in the claimant's depression or anxiety. He continued the claimant on Zoloft and Ativan. (R. 589–92).

On this same date, Dr. Tai completed a medical source statement about the claimant's mental condition. He indicated that the claimant could not reasonably be expected to be reliable in working eight hours a day in a forty hour work week because of anxiety about his poverty and home situation. When asked to assess the claimant's capacity to perform different occupational tasks, Dr. Tai reported that the claimant would have poor capacity to engage in social functioning in a work environment, understand complex instructions, behave in an emotionally stable manner, relate predictably in social situations, or maintain concentration and pace. He reported that the claimant would only have a fair ability to perform activities of daily living free of supervision and understand and follow simple instructions. (R. 565–68).

On May 17, 2015, Dr. Blotcky completed a medical source opinion form about the claimant's mental status and condition. In the report, Dr. Blotcky indicated that the claimant would have marked limitations in responding appropriately to supervisors, using judgment in complex decision making, dealing with changes in routine settings, responding to customary work pressures, and maintaining attention and concentration for at least two hours. He also indicated that the claimant would have moderate limitations maintaining activities of daily

living, maintaining social functioning, responding appropriately to coworkers and the public, and making simple judgment decisions. (R. 574–75).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received a hearing before an ALJ on June 8, 2015. The claimant testified that he moved to Alabama to be with his dying mother and had lived in the state for about a year and seven months before the hearing. The claimant stated that he lost his driver's license in Indiana because he had too many tickets and could not pay his fines. He also stated that he was married but separated from his wife who lived in Florida. The claimant reported that he had no source of income and lived in a shed with no running water on someone else's property. (R. 153, 43–45).

The claimant said he did not graduate high school or obtain a GED after dropping out when he was around sixteen. He previously worked as a cashier at Target but left that job after his female boss "was hitting on [him] and things escalated." He then worked jobs doing maintenance and yard work for different companies before working at Apex Machine Company. At Apex, the claimant deburred metal and did other maintenance work, such as lawn care and refilling bathroom supplies. (R. 45–48).

The claimant said that his eye, back pain, groin pain, and depression kept him from working. He left the job at Apex because the cancerous growth on his face caused him too much pain. He tried to "heal it [himself[" but eventually had an operation to remove the cancerous growth on his face near his left eye. He claimed that, as a result of the surgery, his left eye constantly twitched and watered when he was outside. The claimant testified that ER doctors told him that his skin cancer had returned and that he had a year to have surgery to remove a new growth. The ER

referred him to a dermatologist named Dr. Gene Donahue for his facial pain and Dr. Louis Devilia, a gastroenterologist, for his hernia.[6] (R. 48–50).

The claimant testified that he experienced pain in his groin and lower back; he specifically stated that he had an issue between his L4–L5 vertebrae. He said the consultative physician told him that he had nerve damage. He stated that Dr. Tai treated him for pain in his groin and back, anxiety, and depression. The claimant said that he experienced an episode of syncope in 2011 and was rushed to the hospital; that he still experiences dizzy spells; and that he has atrial fibrillation. The claimant rated the pain on his face a ten on a scale of zero to ten. He rated the pain in his back and hernia a seven on the same scale. He said that he could not stand for long or walk farther than a hundred yards. (R. 50–54).

The claimant reported that he received $194 in food stamps a month and experienced depression and anxiety about his life and living situation. He reported having no family to depend on and was worried that he would be evicted from his current residence. He reported that he has no running water, that the landowner possessed guns, and that his living situation worried him. The claimant said his depression started when his wife left him right around the time he developed his groin injury. He reported taking Zoloft and Ativan for depression and anxiety, and Norco for his pain. He also said that his medication caused him to experience forgetfulness, drowsiness, and problems concentrating. (R. 55–56).

Dr. James Anderson, a medical doctor, reviewed the claimant's available medical records and testified about them as a medical expert at the request of the ALJ. Dr. Anderson reported that the medical records indicated no complications from the claimant's cancer surgery in 2009 and no evidence of any cancer recurrence. He testified that no documentation of recurrence of the

---

[6] The claimant testified to receiving these referrals, but no records from those physicians or this ER visit exist in the record.

syncope or significant treatment for it between 2011 and 2014 existed in the record, likely because the claimant could not pay for treatment. Dr. Anderson stated that excessive marijuana and caffeine use caused the syncopal episode.[7] Dr. Anderson also testified that the claimant's back pain was only treated symptomatically and that physical examinations in the record revealed no pathology for it. Dr. Anderson opined that the claimant's conditions did not meet or equal a listed impairment and that he would be capable of performing light work. (R. 56–58).

Dr. Anderson also testified that a recurrence of the claimant's type of cancer is unusual, but that, if it did recur, surgical removal would be an appropriate treatment. Dr. Anderson also testified that he was uncertain whether the claimant was complaining of hernia pain on his left or right side; that for a hernia recurrence after surgical repair would be unusual; and that patients who develop an inguinal hernia on one side of their body are more likely to develop another one on the opposite side. When asked about Dr. Blotcky's assessment of the claimant, Dr. Anderson replied that it "was not my responsibility to give psychiatric diagnoses." Finally, Dr. Anderson agreed that if the ALJ found Dr. Tai and Dr. Blotcky's reports credible, the claimant would not be capable of working. (R. 59–61).

Dr. Mary Kessler testified at the hearing as a vocational expert about the types of work the claimant could perform. Dr. Kessler classified the claimant's previous cashier job at the medium exertion level and his yard maintenance and deburring metal jobs at the heavy exertion level. She classified the cashier and deburring jobs as semi-skilled and the yard maintenance jobs as unskilled. (R. 62).

The ALJ asked Dr. Kessler to identify jobs the claimant could perform at the light level if he was restricted to no more than occasional exposure to extreme cold or heat and continuous

_____

[7] The court could not find this cause listed in the record for the claimant's syncope and presumes Dr. Anderson was giving his medical opinion after examining the claimant's records.

vibrations; was precluded from working around unprotected heights; could not read small print; and was limited to simple and routine tasks that required occasional contact with the public and coworkers. The ALJ also asked Dr. Kessler if the claimant would be able to return to his job as a cashier. (R. 62–63).

Dr. Kessler testified that the claimant could not work as a cashier, but that other jobs existed that he could perform with the ALJ's restrictions. Dr. Kessler stated that the claimant could work as an assembler, with 6,200 jobs in state and 89,800 nationally; as a packer, with 5,500 jobs available in the state and 483,500 nationally; and as a machine operator or tender with 1,300 jobs in the state and 229,000 nationally. (R. 63–64).

When the ALJ further restricted the claimant to sedentary work, Dr. Kessler stated that he could work as a production or table worker, with 1,200 jobs available in the state and 407,000 nationally; as an assembler or packager at the sedentary level, with 900 jobs in state and 26,000 nationally; and as a surveillance system monitor, with 500 jobs in state and 21,000 nationally.

Dr. Kessler also testified that employers have no tolerance for missing more than one or one-and-a-half days of work a month or for employees who are off task more than five percent of the time. Dr. Kessler stated that, if the ALJ gave great weight to the opinions of Dr. Tai or Dr. Blotcky, or the claimant's subjective testimony, the claimant would not be able to work because his pain would make him off task more than five percent of the time. (R. 64–66).

*The ALJ's Decision*

On July 25, 2015, the ALJ issued a decision finding that the claimant does not have an impairment or combination of impairments qualifying as a disability. The ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31,

2011. He also found that the claimant had not engaged in substantial gainful activity since his alleged onset of disability, March 31, 2009. (R. 23–24).

In his findings of fact, the ALJ mentioned that Dr. Blotcky examined the claimant on March 16, 2015. He noted that Dr. Blotcky administered the WAIS-IV test to the claimant and that the test indicated the claimant had an IQ of 70. The ALJ also mentioned that Dr. Blotcky reported the claimant had a GAF score of 49. and that Dr. Blotcky believed the claimant's prognosis was poor and that he experienced marked limitations. (R. 27).

The ALJ determined that the claimant has the severe impairments of a basal cell carcinoma removal of the left nasal fold, an uncomplicated inguinal hernia with resulting groin pain, depression, and lower back pain. (R. 31).

The ALJ determined that the claimant only has mild restrictions in daily activities based on the reports from Dr. Blotcky and Dr. Moizuddin that the claimant spent most of his time watching television, doing some light housework, and watching sunsets for personal enjoyment. Next, the ALJ found that the claimant had only moderate difficulties in social functioning because Dr. Blotcky reported the claimant had one close friend. Next, the ALJ found that the claimant had only moderate difficulties with concentration and persistence based on Dr. Blotcky's report that the claimant's memory was intact but that his abstract thinking was limited. The ALJ also noted that the claimant testified that his medications made him experience concentration and memory limitations. Finally, the ALJ determined that the claimant had no episodes of decompensation. (R. 24).

The ALJ next determined that the claimant has the residual functional capacity to perform light work, except that he can have only occasional exposure to extreme cold or heat and continuous vibrations; cannot work around unprotected heights; cannot read small print; must

avoid continuous exposure to direct sunlight; can perform only simple, routine tasks; and can have only occasional contact with the general public and coworkers. (R. 25).

In making this decision, the ALJ stated that he considered all of the claimant's symptoms to the extent these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. The ALJ determined that the claimant's impairments could reasonably be expected to cause his symptoms, but that the claimant's statements about the intensity and limiting effects of these symptoms are not credible based on the objective medical evidence in the record. (R. 25, 28).

The ALJ gave the claimant's statements that his cancer had reappeared on his nose and face no credit because the 2009 surgery successfully removed the cancer with no complications. The ALJ noted that the record contained no medical evidence describing a recurrence of the cancer or further treatment, and that the claimant's treating physician, Dr. Tai, made no comment about the cancer outside of documenting it in the claimant's medical history. (R. 28).

The ALJ also found that objective medical evidence did not support the claimant's testimony about his pain. The ALJ noted that during his consultative exam with Dr. Moizuddin, the claimant could walk normally and had no problems getting on and off the examining table. The ALJ also noted that the claimant had received "no more than conservative treatment" despite his allegations of disabling pain. (R.28).

Finally, the ALJ discredited the claimant's testimony about his depression because "the claimant has not received any actual mental health treatment and [his depression] still only required no more than conservative treatment." (R. 28).

The ALJ gave significant weight to Dr. Anderson's testimony because he was the only physician who examined the entire record and had familiarity with the Social Security

Administration. The ALJ also gave significant weight to the opinion of the consultative physician Dr. Moizuddin because her opinion was consistent with the medical evidence on record and the claimant's established residual functional capacity. (R. 29).

The ALJ gave partial weight to Dr. Blotcky's opinion about the claimant's limited abilities to perform work tasks because he believed the claimant's mental abilities "are not to the degree suggested by the clinician." The ALJ gave minimal weight to the claimant's treating physician Dr. Tai because objective medical findings do not support his opinions. Dr. Tai's initial examination of the claimant revealed only spinal tenderness at the L2-L5 vertebrae but he said the claimant was disabled; the ALJ also said that Dr. Tai's findings do not support opinions from his clinical assessment of the claimant's pain. (R. 29).

The ALJ determined that the claimant is unable to perform his past relevant work as a cashier, yard maintenance worker, or deburring machine parts. Based on the claimant's residual functional capacity and the vocational expert's testimony, the ALJ determined that the claimant could perform light, unskilled work with jobs available for him in the state and national economies as an assembler, packer or packager, and machine operator or tender. Therefore, the ALJ found that the claimant was not disabled under the Social Security Act. (R. 29–31).

## VI. DISCUSSION

The claimant argues that the ALJ improperly failed to consider Listing 12.05(C) for "intellectual disability" in light of Dr. Blotcky's assessment that the claimant has a full-scale IQ score of 70, which fell within the range qualifying for Listing 12.05(C). This court agrees and finds that the ALJ erred by not considering the claimant's presumptive disability under Listing 12.05(C).

In the present case, to meet his burden of presumptive disability under lIsting 12.05(C), the claimant presented Dr. Blotcky's report indicating that the claimant has a full-scale IQ score of 70. The claimant also presented evidence that he dropped out of high school and was a slow learner in regular classes; did not have a GED; did not drive; lived alone in a shed; and suffered from depression and suicidal thoughts. Despite this evidence in the record, the ALJ did not even discuss or consider whether the claimant met a Listing under 12.05(C). This failure constituted error.

In his findings of fact, the ALJ *mentioned* Dr. Blotcky's report indicating the claimant had a full-scale IQ score of 70, but failed to mention or discuss Listing 12.05 at all when considering if the claimant met any of the disability Listings. Moreover, the ALJ gave no analysis regarding why that IQ score was invalid or why it did not reflect the claimant's level of intellectual functioning. Rather than discussing whether the claimant satisfied 12.05(C), the ALJ stated that he gave Dr. Blotcky's opinion only partial weight because the claimant's limitations "are not to the degree suggested by the clinician." (R. 29). Substantial evidence does not support the vague statement that the ALJ gave regarding why he gave Dr. Blotcky's opinion only partial weight.

While Dr. Blotcky was a consultative psychologist, he was the *only* medical source who administered an objective IQ test to the claimant, reporting that the claimant was motivated during the exams and that the results were valid. (R. 573). While a low IQ is not completely indicative of disability, the ALJ in this matter did not expressly dismiss the score with other evidence in the record. *See Perkins*, 553 F. App'x at 873 (a low IQ score does not automatically indicate disability if that score is inconsistent with other evidence in the record).

Dr. Blotcky reported that the claimant's IQ of 70 indicated he had borderline intellectual ability and that his intellectual deficit was a "lifelong problem"; that the claimant had a GAF

score of 49, which indicated that he had serious symptoms or serious social and occupational impairments; and that the claimant needed therapy and medication to treat his problems. He also indicated that the claimant would have marked limitations in several work-related tasks such as responding appropriately to supervisors, making complex decisions, responding to customary work pressures, and maintaining attention and concentration for at least two hours. He also reported that the claimant had a restricted affect, cried during the interview, and that his verbalizations "were morbid in content." The ALJ gave no analysis or explanation as to how the limitations espoused by Dr. Blotcky were not valid. The ALJ simply stated a conclusion with no reasoning. If the ALJ believed that Dr. Blotcky's report about the claimant's depression and IQ score was inconsistent with other evidence in the record, he should have at least explained his reasons or ordered another consultative psychological examination of the claimant.

Contrary to the ALJ's vague treatment of Dr. Blotcky's opinion and IQ testing results, substantial evidence in the record supports Dr. Blotcky's opinion about the severity of the claimant's mental impairments. The claimant's treating physician Dr. Tai reported that the claimant complained of depression, suicidal thoughts, and anxiety about his living situation. Dr. Tai prescribed the claimant Zoloft and Ativan to treat depression and anxiety; provided some counseling; and advised him to seek psychiatric care if necessary. Dr. Tai also indicated in a mental medical source statement that the claimant has poor capacity to engage in social functioning in a work environment, understand complex instructions, behave in an emotionally stable manner, or maintain concentration and pace. The claimant told the Social Security Administration's consultative physician Dr. Moizuddin, that he experienced depression, a depressed mood, and anxiety. (R. 549, 586–91).

The ALJ agreed that the claimant had some limitations but his failure to adequately explain what portions of Dr. Blotcky's report he credited or what evidence in the record supported the decision to give Dr. Blotcky's opinion only partial weight is reversible error. *See McCloud*, 166 F. App'x at 418 (the ALJ must state with particularity the weight he gives to each medical opinion and explain the reasons for that weight).

In the present case, the claimant presented a valid IQ score, in the requisite range to fall under Listing 12.05(C), determined by the *only* psychological medical source to examine him; testified that he dropped out of high school when he was sixteen; reported he was a slow learner; did not have a GED; and had evidence of another severe mental impairment. However, despite this evidence pointing to the claimant possibly meeting Listing 12.05(C), the ALJ failed to discuss and consider if the claimant met that Listing. That failure was reversible error.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the ALJ erred as a matter of law and substantial evidence does not support his findings. The court finds that the decision of the ALJ is due to be REVERSED and REMANDED for further proceedings regarding whether the claimant meets Listing 12.05(C).

The court will enter a separate Final Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 24th day of September, 2018.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE